IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WILLIAM J. DAVIS,                    )
                                     )
         Plaintiff,                  )
                                     )
v.                                   )        CIVIL ACTION 05-0641-WS-C
                                     )
GREAT SOUTHERN WOOD                  )
PRESERVING, INC.,                    )
                                     )
         Defendant.                  )

## ORDER

This matter is before the Court on defendant's Motion for Summary Judgment (doc. 21).[1]  The Motion was accompanied by a memorandum (doc. 22), proposed determinations of uncontroverted fact and conclusions of law (doc. 23), and a compendium of exhibits (doc. 24).  An Order (doc. 25) entered on December 14, 2006 directed any party opposing the Motion to file a response on or before January 12, 2007.  To date, plaintiff (who is represented by counsel) has neither responded to the Motion nor requested an enlargement of time.  The time for submitting an opposition brief having long since expired, the Motion is now ripe for disposition.

I.    **Background.**[2]

This employment discrimination action involves claims of disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); race discrimination

---

[1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir.  2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  Thus, plaintiff's evidence (had he presented any) would be taken as true and all justifiable inferences from the record are drawn in his favor.

under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

("Title VII"); and retaliation under Title VII.

        **A.**        ***Plaintiff's Employment at Great Southern.***

       Plaintiff William J. Davis ("Davis"), an African-American male, began working for defendant

Great Southern Wood Preserving, Inc. ("Great Southern") as a truck driver at its Mobile, Alabama

facility in June 1999. (Davis Dep., at 11; White Decl., ¶ 4.)[3]  In June 2003, Davis and three other

African-American truck drivers sued Great Southern in federal court in the Middle District of Alabama

alleging that the company had engaged in race discrimination, in violation of Title VII and § 1981, with

regard to work assignments, compensation, discipline, promotions and other terms and conditions of

employment.  That lawsuit (hereinafter, the "*Cooley* litigation") was dismissed on summary judgment in

September 2004.[4]

       As a truck driver for Great Southern, Davis was subject to Department of Transportation

("DOT") regulations for drivers of commercial vehicles.  (Davis Dep., at 12.)  Among the DOT

regulations with which Davis had to comply was a requirement that he maintain a current medical

certificate confirming that he met the requisite DOT safety standards.  (Taylor Decl., ¶ 2; White Decl., ¶

7.)[5]  On July 9, 2003, Dr. Terry Taylor (an outside, private physician that Great Southern sometimes

uses for drivers' exams, workers' compensation exams and the like) issued a DOT certification to

Davis that expired on July 9, 2004.  The temporal scope of that certification was limited because Dr.

---

       [3]       Two different depositions of plaintiff are referenced in the record.  The earlier
deposition was taken on March 12, 2004 in a case filed in the Middle District of Alabama, and will be
referred to herein as "Davis 2004 Dep."  The later deposition was taken in this case on October 27,
2006, and will be referred to herein simply as "Davis Dep."

       [4]       At least one of the African-American truck-driver plaintiffs in the *Cooley* litigation,
Elisha Cooley, has been continuously employed at Great Southern since that lawsuit began, and remains
at Great Southern's Mobile facility today.  (Davis Dep., at 86-88; White Decl., ¶ 14.)

       [5]       The pertinent regulation specifies that "[a] person shall not drive a commercial motor
vehicle unless he/she is physically qualified to do so and ... has on his/her person ... a medical
examiner's certificate that he/she is physically qualified to drive a commercial motor vehicle."  49
C.F.R. § 391.41(a).

Taylor found that Davis's hypertension condition required re-evaluation on an annual basis.  (Davis Dep., at 29-30, 36 & Exh. 1.)

As a truck driver for Great Southern, Davis drove both sleeper cabs (trucks with sleeping compartments to be used on overnight trips) and day cabs (tracks lacking such compartments that could only be used on day trips) at various times.  (Davis Dep., at 11-12, 16-17.)  After experiencing knee swelling on overnight runs, Davis was confined to day runs as of late 2003 and early 2004.  (*Id.* at 13-17.)[6]  In late 2003, Great Southern changed its dispatching system in such a manner that all drivers with sleeper cab trucks might be subject to overnight assignments.  (White Decl., ¶ 8.)  This modification was announced at meetings that Davis attended.   (Davis Dep., at 18; Davis 2004 Dep., at 34-35.)  Sometime later, in December 2003 or January 2004, Great Southern responded to Davis's requests for a better truck than the 1992 day cab he had been driving by assigning him a 1996 sleeper cab truck.  (White Decl., ¶ 9; Davis Dep., at 28-29; Davis 2004 Dep., at 35.)  This 1996 sleeper cab was the only better truck available to give Davis, and there were no newer model day cabs available.  (White Decl., ¶ 9.)  Thus, as of early 2004, Davis was driving a sleeper cab, and was therefore subject to the new dispatch system under which he could conceivably be assigned an overnight run.  A couple of months later, that potentiality became reality.

**B.**     ***The Medication Revelation.***

On March 25, 2004, Davis dropped off a load in Port Allen, Louisiana, and stopped in Picayune, Mississippi on the return trip to Mobile to pick up another load.  (Davis Dep., at 30-31.)  At that time, he was assigned a load to take to Orlando, Florida.  This would have required an overnight haul, Davis's first since the new dispatch system went into effect.  (*Id.* at 29-31.)  Upon receiving the assignment, Davis called Dewane Hayes, Great Southern's Traffic Manager in Mobile, and said, "you know I don't make overnight runs."  (*Id.* at 32.)  In the ensuing discussion, Davis disclosed to Hayes for the first time that he was taking medication that made him drowsy, even suggesting that the truck

---

[6]     The evidence is not that Davis was medically barred from overnight runs at that time; rather, when questioned as to whether he had told his supervisor that he was medically unable to do overnight runs, Davis testified, "No, that's not telling him that I couldn't do it.  It was telling him I prefer not to do it."  (Davis Dep., at 16.)

would end up in a ditch if he took the load.  (*Id.* at 32-35; Hayes Decl., ¶ 5.)  Plaintiff agrees that "anyone who is taking medication that makes them drowsy has no business being behind the wheel of an eighteen-wheeler."  (Davis Dep., at 36.)  Ultimately, Hayes instructed Davis simply to bring the load back to Mobile, which he did.  (*Id.*)  Given the obvious safety ramifications of having a tractor trailer driver taking medication that induces drowsiness, Hayes advised Davis that he would not be permitted to drive for Great Southern until he obtained a medical release clearing him to drive a truck while taking such medication.  (Hayes Decl., ¶ 5.)

### C.    *Efforts to Obtain Medical Clarification.*

The very next day, on March 26, 2004, Davis saw his personal physician, Dr. Edward Carlos, who provided a note advising Davis "not to take long hauls because of his diabetes and arthritis." (Davis Dep., at 37 & Exh. 2.)  In response to Great Southern's requests for clarification as to the meaning of "long hauls," Dr. Carlos did not delineate the term more precisely, but stated that Davis's medication was to be taken only at the end of the workday, not before or while driving.  (Hayes Decl., ¶ 6.)  This statement did not allay Hayes' concerns about the medical restrictions (if any) that might be necessary for Davis safely to drive a truck for Great Southern, given Dr. Carlos's vagueness about "long hauls."  Questions remained as to whether and, if so, how much Davis could safely drive.

During the next three months, Davis received no driving assignments from Great Southern. Instead, there was a series of communications between Hayes and Dr. Carlos as Great Southern attempted to ascertain what medical restrictions might exist with respect to Davis's driving abilities. (Hayes Decl., ¶¶ 7-8.)[7]  In the course of those discussions, Hayes informed Dr. Carlos that Great Southern wanted Davis to return to work as soon as possible, but that additional information was necessary concerning the number of hours that Davis could safely drive each day and whether Davis

---

[7]    Contributing to the confusion was the difference in opinion between Davis's personal physician, Dr. Carlos, and the company-selected physician, Dr. Taylor.  As mentioned, Dr. Carlos opined in March 2004 that Davis was unable to take "long hauls" because of his medical limitations; however, Dr. Taylor examined Davis during the same time period and determined that he did not suffer from any medical conditions that required accommodations or restrictions.  (Davis Dep., at 38-39; Taylor Decl., ¶ 3.)

had been instructed to take his drowsiness-inducing medication only at the end of the workday.  (*Id.*; Davis Dep., at Exh. 3.)  Hayes explained to Dr. Carlos that these inquiries were prompted by Great Southern's "obligation to ensure that drivers do not operate 18-wheelers on the roads if they have to take medication which will make them drowsy while driving."  (*Id.*)  On June 18, 2004, Great Southern received a written response from Dr. Carlos that outlined Davis's medical conditions (*e.g.*, degenerative disc disease of the cervical spine, diabetes, hypertension) and indicated that Davis's neck pain and right arm numbness were exacerbated by driving a truck.  Dr. Carlos's letter was not otherwise responsive to Great Southern's detailed inquiry.  (Hayes Decl., ¶ 8; Davis Dep., at Exh. 4.)  Such unresponsiveness by plaintiff's personal physician to defendant's reasonable job-related queries prompted yet another round of dialogue between Great Southern and Dr. Carlos as the company struggled to ascertain what driving limitations, if any, Davis had.

Finally, on June 30, 2004, Davis supplied Hayes with medical documentation reflecting Dr. Carlos's opinion that he was medically able to drive a truck, provided that he remained within a 250-mile radius because longer hauls could exacerbate his health conditions.  (Davis Dep., at Exhs. 6-8; Hayes Decl., ¶ 9.)[8]  Concurrently with this medical documentation, Davis submitted a written request for "a reasonable accommodation of no long haul runs over 250 miles" each way and asked to return to work immediately.  (Davis Dep., at Exh. 6.)  Having thus received clarification from Davis's physician as to what specific constraints were needed to enable him to drive safely, Great Southern officials met to determine whether this requested accommodation could be granted, in light of the company's operational and personnel needs.  The company decided that it would be possible to assign Davis driving responsibilities that would respect a 250-mile boundary, in deference to plaintiff's requested accommodation.  (Hayes Decl., ¶ 10; White Decl., ¶ 10.)

### D.    *The Denial of Medical Certification.*

As these events transpired, Davis's DOT-mandated medical certification lapsed on July 9, 2004.  Hayes notified Davis of this fact on July 12, 2004.  (Hayes Decl., ¶ 10.)  Hayes instructed Davis

---

[8]    This medical documentation from Dr. Carlos was dated June 7, 2004 and June 11, 2004, but had not been previously furnished to Great Southern.

to renew his certification, at which time Hayes would meet with him to discuss a game plan for returning Davis to work and identifying loads that Davis could carry.  (*Id.*)  As of July 12, 2004, then, Great Southern was ready and willing to restore Davis to full duty, provided that he first obtained the medical certification required of all commercial drivers by DOT regulations.

The following day, on July 13, 2004, Davis went to Dr. Taylor's office to renew his DOT medical certification.  (Davis Dep., at 51-52.)  At that time, Davis informed Dr. Taylor of his degenerative disc disease that caused him pain while driving and his history of vertigo.  (Taylor Decl., ¶ 4.)  Based on that information, as well as Davis's high blood pressure and missing digits on his left hand, Dr. Taylor temporarily disqualified Davis from driving until he had an opportunity to review Dr. Carlos's medical records.  (*Id.* & Exh. C.)  Upon review of those records, Dr. Taylor concluded that Davis did not satisfy DOT safety standards for obtaining a medical certificate for a commercial driver's license.  (Taylor Decl., ¶ 4.)  He therefore revised his written opinion to state: "Temporary restriction changed to new opinion - <u>does not meet standards</u>."  (*Id.* at Exh. D.)  A letter from Dr. Taylor to Great Southern dated August 16, 2004 summarized his opinion as follows: "I have evaluated Mr. Davis under the Department of Transportation Guidelines for a commercial driver medical certificate.  It is my opinion he does not meet medical standards and is totally disqualified."  (*Id.* at Exh. E.)  There is no evidence that Great Southern in any way influenced or attempted to influence Dr. Taylor's medical opinion concerning Davis's fitness for driving pursuant to DOT safety standards.  (*Id.*, ¶¶ 4-5.)

Great Southern concluded that, as a legal matter, Davis's lack of DOT medical certification disqualified him from driving a commercial vehicle.  (White Decl., ¶ 12.)  The company checked for any vacant positions in its Mobile facility that did not require a commercial driver's license, but none existed.  (*Id.*)  Accordingly, Robert White, General Manager of the Mobile plant, decided to terminate Davis's employment because he was not legally qualified to drive a truck and there were no available, vacant positions that he could perform.  (*Id.*)  That said, White deemed Davis eligible for rehire if he obtained a medical certification in the future.  (*Id.*)  The termination decision and Davis's eligibility for rehire were communicated to him via letter dated September 3, 2004.  (Davis Dep., at 56-57 & Exh.

12.)[9]

The record reflects that Davis went to a third doctor, Dr. Hicks, on September 7, 2004, and that Dr. Hicks did in fact provide him with the requisite DOT medical certification. (Davis Dep., at 58 & Exh. 13.) Notwithstanding that certification, Davis never brought that information to Great Southern's attention or otherwise availed himself of the company's invitation to reapply. (Davis Dep., at 59.) On October 11, 2004, Great Southern hired J.T. McCants, an African-American male, to fill the vacancy created by Davis's discharge. (White Decl., ¶ 13; Hayes Decl., ¶ 12.)

E.      *Plaintiff's Claims.*

The exact nature and form of plaintiff's claims in this litigation are difficult to discern because of the multiplicity of unfocused allegations in the Complaint and plaintiff's failure to respond to the Rule 56 Motion. Nonetheless, the Complaint reflects that the following theories and claims are at issue: (1) an ADA claim predicated on defendant's failure to provide plaintiff's "requested reasonable accommodation" (Complaint, ¶ 71); (2) a Title VII claim alleging that defendant's refusal to allow plaintiff to work from March 25, 2004 through September 3, 2004 was retaliation for prior protected EEO activity; (3) a Title VII retaliation claim alleging that plaintiff was fired for his involvement in prior protected EEO activity; (4) Title VII retaliation claims predicated on defendant's opposition to plaintiff's claims for workers' compensation and short-term disability benefits; (5) a claim generically alleging that defendant's unspecified "treatment of Mr. Davis" constituted race discrimination in violation of Title VII and § 1981 (*Id.*, ¶ 76); and (6) similarly vague claims of disability discrimination under the ADA and retaliation under Title VII based on defendant's "treatment of Mr. Davis" (*Id.*, ¶¶ 77-78).[10]

---

[9]      The September 3 letter specifically left open the possibility of rehire, as follows: "Please know that you are eligible for re-hire and should you later obtain the required medical certification, please feel free to reapply for any vacant commercial truck driver position with Great Southern Wood Preserving, Inc." (Davis Dep., at Exh. 12.)

[10]      Cursory allegations of discrimination and retaliation in "[d]efendant's treatment of Mr. Davis" do both the parties and this Court a disservice by rendering it unclear as to exactly what personnel decisions are being challenged. The problem is compounded by plaintiff's failure to respond to the Motion, leaving only a cryptic complaint as an indication of his specific theories of liability. The Court will not guess as to what plaintiff might have meant. The Complaint is clear that plaintiff is

Those claims and theories of liability are the subject of the pending Rule 56 Motion.

**II.      Summary Judgment Standard.**

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not necessarily compel denial of a motion for summary judgment; rather, only material factual disputes preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of

---

complaining about an alleged failure to provide a requested accommodation, a decision not to allow Davis to work from late March 2004 through early September 2004, a decision to terminate Davis's employment, and opposition to Davis's claims for short-term disability and workers' compensation benefits.  Accordingly, those decisions alone will be considered on summary judgment, notwithstanding the Complaint's enigmatic "catch-all" reference to unspecified "treatment."

the scale." *Id.* at 1086 (citation omitted).

As noted, Davis filed no response to the Motion.  Summary judgment is not automatically granted by virtue of a nonmovant's silence.[11]  Nonetheless, the Eleventh Circuit has provided clear guidance that a court is not obligated to read minds or to construct arguments or theories of relief that counsel have failed to raise and that are not reasonably presented on the face of the pleadings.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."); *see also Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 142 (3rd Cir. 2001) ("The ruling on a motion for summary judgment is to be made on the record the parties have actually presented, not on one potentially possible."); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (declaring that a "party who aspires to oppose a summary judgment motion must spell out his arguments squarely and distinctly, or else forever hold his peace," as district court may ignore arguments not adequately developed by nonmovant).  Clearly, "the onus is upon the parties to formulate arguments."  *Resolution Trust*, 43 F.3d at 599.  Accordingly, Davis's decision not to proffer argument, evidence or authority in response to the Motion is at his peril.

## III.   Analysis.

Plaintiff's myriad causes of action will be examined by category, based on each particular type of unlawful discrimination alleged to have occurred (race, disability, retaliation).

### A.   *Race Discrimination Causes of Action.*

#### 1.   McDonnell Douglas *Burden-Shifting Standard.*

---

[11]      *See, e.g.*, *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2nd Cir. 2004) ("Although the failure to respond may allow the district court to accept the movant's factual assertions as true ..., the moving party must still establish that the undisputed facts entitle him to a judgment as a matter of law"); *Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) ("the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment"); *but see Isquith for and on Behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir. 1988) (citing as "general rule" that "summary judgment was appropriate because the nonmovant, although faced with a summary judgment motion, chose not to respond to the motion at all").

In the absence of direct evidence of race discrimination, Davis must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this familiar, tripartite burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination.[12]  If he does so, that showing "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11ᵗʰ Cir. 2005).  At that point, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]. ... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11ᵗʰ Cir. 1997) (citations omitted).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11ᵗʰ Cir. 2006) (quotation omitted).  The ultimate burden of persuasion remains with the plaintiff.  *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11ᵗʰ Cir. 2002).  Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11ᵗʰ Cir. 2000).

A plaintiff establishes a *prima facie* case of discriminatory discharge in violation of Title VII by showing that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he "was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class."  *Maynard v. Board of Regents of Div. of Universities of Florida Dep't of Educ. ex rel. University of South Florida*, 342 F.3d 1281, 1289 (11ᵗʰ Cir. 2003).  More generally, a plaintiff makes a *prima facie* showing of disparate treatment under Title VII by demonstrating that: (1) he belongs to a racial

---

[12]    Davis's burden of establishing a *prima facie* case is not onerous.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11ᵗʰ Cir. 2001).

minority; (2) he was subjected to an adverse job action; (3) his employer treated similarly situated employees outside his protected class more favorably; and (4) he was qualified to do the job.  *See Wilson*, 376 F.3d at 1091; *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).

2.    *Plaintiff Has Not Established a* Prima Facie *Case.*

The Complaint alleges race discrimination in Great Southern's termination of Davis's employment and in its "treatment" of him generally.  (Complaint, ¶ 77.)  Title VII caselaw provides, however, that "[a] plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably.  *McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class."  *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005); *see also Underwood*, 431 F.3d at 794 (finding that Title VII plaintiff in failure-to-hire context must show that successful applicant was not within his protected class); *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995) (in termination case, *prima facie* burden requires showing that plaintiff was replaced by person outside protected class).  "Only after the plaintiff has made his *prima facie* case does the burden shift to the defendant."  *Morris*, 402 F.3d at 1082.[13]

Careful scrutiny of the record reveals no indication that Great Southern treated any white

---

[13]    Plaintiff's race discrimination claims also sound in § 1981; however, the analysis for those claims is no different than it is for the Title VII claims.  Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts, and extends to the employment context.  *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1270 (11th Cir. 2004).  Although § 1981 claims do not share the exhaustion requirement of their Title VII counterparts, their elements are identical in a disparate treatment case.  Indeed, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Cooper v. Southern Co.*, 390 F.3d 695, 724 n.16 (11th Cir. 2004) ("The *McDonnell Douglas* framework for establishing a *prima facie* case is used in intentional discrimination cases brought under either Title VII or Section 1981."); *Sanders v. City of Montgomery*, 319 F. Supp.2d 1296, 1311 (M.D. Ala. 2004) ("The legal analysis of claims of race discrimination pursuant to either Section 1981 and Title VII is the same.").  This Court therefore relies on the same framework to analyze plaintiff's race claims under both Title VII and § 1981.

-11-

employee more favorably than Davis.  To the contrary, it is uncontroverted that the person who

replaced Davis was African-American, just like Davis.  Plaintiff has not identified a single Great

Southern employee not of his protected class who was treated better than he.  Under the principles

articulated by the Eleventh Circuit in *Morris*, this shortcoming is fatal to Davis's ability to establish a

*prima facie* case of race discrimination.  Accordingly, the Court need not reach the questions of

legitimate nondiscriminatory reasons or pretext, as plaintiff's Title VII and § 1981 race discrimination

claims founder at the *prima facie* stage.[14]

> **B.      ADA Causes of Action.**

A fair reading of the Complaint is that Davis charges Great Southern with violating the ADA in

failing to grant him a reasonable accommodation and terminating his employment.  Each of these

theories will be discussed in turn.

> **1.      Reasonable Accommodation.**

The ADA requires an employer to provide reasonable accommodations for an employee with a

disability, unless doing so would impose an undue hardship on the employer.  *See Lucas v. W.W.*

*Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *see also Earl v. Mervyns, Inc.*, 207 F.3d

1361, 1365 (11th Cir. 2000) ("An employer must provide reasonable accommodations for employees

with known disabilities unless such accommodations would result in undue hardship to the employer.").

"An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to

---

[14]      Even if Davis had successfully made a *prima facie* showing, his race discrimination
claims would still fail.  Great Southern's evidence reflects that it sidelined Davis in May 2004 not
because of his race, but because of the revelation that he was taking medication that could make him
drowsy while driving.  Great Southern's evidence likewise reflects that it terminated Davis not because
he is African-American, but because he lacked a DOT-required medical certification to drive a
commercial truck, his principal job duty.  "[T]o avoid summary judgment [the plaintiff] must introduce
significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."
*Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir.1993) (citation omitted).  "The heart of
the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the
discharge, but whether the employer really was motivated by those reasons."  *Standard*, 161 F.3d at
1333.  There is no evidence in the record from which a reasonable factfinder could conclude that the
employer's asserted reasons for the challenged personnel decisions were pretextual.

perform the essential functions of the job." *Earl*, 207 F.3d at 1365.

Taken in the light most favorable to plaintiff, the record evidence is that Great Southern did not deny Davis any reasonable accommodations.  To be sure, on June 30, 2004, Davis requested that he be restored to work with "a reasonable accommodation of no long haul runs over 250 miles."  The evidence is that Great Southern promptly considered his request, and responded within a reasonable time period thereafter.  In particular, on July 12, 2004, Great Southern notified Davis that it would accommodate his request, provided that he first renewed his now out-of-date medical certification which, under applicable DOT regulations, was a legal prerequisite to his driving a commercial vehicle.  Unless and until he secured the necessary certification, Davis's request for accommodation in work assignments was premature because he was unable to perform the essential functions of his job (*i.e.*, driving an 18-wheeler) at all.  The uncontroverted evidence is that Great Southern was prepared to provide Davis with driving assignments that honored his request for accommodation, provided that he first satisfied the legal prerequisites for commercial driving.  Davis never satisfied those requirements for the remainder of his employment at Great Southern; to the contrary, Dr. Turner issued a medical opinion that Davis did not meet DOT standards and could not drive a commercial vehicle at all.  That medical opinion rendered Davis's request for accommodation in driving assignments moot because he was legally disqualified from driving a truck for Great Southern.

In ADA terms, Davis's requested accommodation was not reasonable, and therefore not required, because had it been granted, Davis would have remained incapable of performing the essential functions of his job.  Davis was legally barred from driving a truck because of forces unrelated to the distance of particular job assignments; therefore, it would have been the height of folly for Great Southern to offer Davis driving assignments of under 250 miles when both Davis and Great Southern knew that DOT regulations prohibited Davis from performing commercial driving of any distance.  Clearly, defendant did not violate the ADA by virtue of this omission.

####    2.    *Discriminatory Discharge.*

Davis also alleges that he was fired because of his disability.  Courts routinely apply the *McDonnell Douglas* burden-shifting framework described above to ADA actions in which the plaintiff

relies on circumstantial evidence. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004); *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). As in the race discrimination context, Davis's ADA claims of discriminatory discharge fail for want of a *prima facie* case.

In this Circuit, "to establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must demonstrate that (1) he has a disability, (2) he is a 'qualified individual,' which is to say, able to perform the essential functions of the employment position that he holds or seeks with or without reasonable accommodation, and (3) the defendant unlawfully discriminated against him because of the disability." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1226 (11th Cir. 2005); *see also Collado v. United Parcel Service, Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005); *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004).

As a threshold matter, this record shows that Davis was not disabled. Davis testified that since his employment at Great Southern has ended, he has received no new medical restrictions. (Davis Dep., at 72.) He spends his time "clean[ing] the yard" and "work[ing] around the house." (*Id.* at 70.) He is physically capable of making day runs, and is under no driving restrictions other than Dr. Carlos's 250-mile one-way cap. (*Id.* at 69-71.) He has no problems seeing with corrective lenses, walking, hearing, breathing, sleeping, eating, or taking care of his personal needs. (*Id.* at 72-73.) Undoubtedly, there is evidence that Davis has a variety of impairments, including degenerative disc disease, hypertension and diabetes. To show that he has a disability, however, Davis would need to provide "evidence from which a jury reasonably could find that his [impairment] substantially impairs at least one major life activity." *Collado*, 419 F.3d at 1155. This he has not done. ADA regulations define "major life activities" as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). No substantial impairment of any major life activity is evident on this record. Viewed in the light most favorable to plaintiff, the evidence shows that Davis cannot drive more than 500 miles roundtrip on a given day, but that he otherwise has no medical restrictions or limitations. These facts do not satisfy the threshold of a

-14-

disability for ADA purposes.[15]

Assuming that Davis was disabled within the meaning of the ADA, there can be no dispute that he was not an otherwise qualified individual at the time of his discharge. Great Southern terminated Davis's employment on September 3, 2004, after a private physician refused to certify him for commercial driving based on a determination that he could not satisfy DOT regulations. Absent such a certification, Davis was not able to perform the essential functions of the truck driver position, irrespective of what accommodations he might have been granted, because it was unlawful for him to drive a commercial vehicle. Clearly, Davis was not a "qualified individual" for ADA purposes as of his September 3 discharge.

Because the record taken in the light most favorable to plaintiff shows that Davis was neither disabled nor a qualified individual with a disability, he cannot show a *prima facie* case of disability discrimination with respect to the termination of his employment, and his ADA claim must fail.[16]

―――――――――――――――

[15]     To be sure, Dr. Taylor medically disqualified Davis from driving a commercial vehicle at all. But driving is not a major life activity for purposes of the ADA. *See Collado*, 419 F.3d at 1157-58. Besides, this disqualification was temporary, because Davis received a medical certification from Dr. Hicks a month later, just days after his discharge. The temporary inability to drive a commercial vehicle does not amount to a substantial impairment of the major life activity of working. *See id.* at 1157 ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working," but must instead encompass a class or broad range of jobs). The temporary aspect of the restriction is significant. *See* 29 C.F.R. § 1630.2(j)(2) (in determining whether an impairment is substantially limiting, courts consider its nature and severity, its duration or expected duration, and its permanent or long-term impact).

[16]     If the Complaint is read broadly, one might conclude that Davis also intends to bring an ADA claim relating to the company's failure to allow him to return to work between March 25, 2004 and the July 9 expiration of his DOT certification. If such a claim were being brought (which is far from clear, given the ambiguities in the pleading), the result would be the same. There is no evidence that Davis was disabled during that time period. Even if there were, Great Southern has articulated a legitimate nondiscriminatory reason for not allowing Davis to drive during that interval, to-wit: that it required clarification as to whether the newly-disclosed drowsiness-inducing medication Davis was taking might impair his safety on the road. Plaintiff's physician contributed substantially to the delay by being unhelpful in providing reasonably necessary clarifications. Plaintiff has not challenged, and cannot reasonably challenge, the legitimacy of that proffered explanation, nor can he otherwise show it to be pretext. To the contrary, Davis told his boss that his truck could end up in a ditch because of that

### C.    Retaliation Causes of Action.

Finally, the Complaint charges Great Southern with violating the anti-retaliation provisions of Title VII by refusing to allow Davis to work from March 25, 2004 through September 3, 2004; firing Davis; opposing Davis's claim for workers' compensation benefits; and opposing Davis's claim for short-term disability benefits.  (Complaint, ¶¶ 72-75.)[17]

#### 1.    Legal Standard.

In addition to prohibiting employment discrimination on the basis of race, Title VII bars an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("Retaliation is a separate violation of Title VII.").[18]  In the absence of direct evidence, Title VII retaliation claims turn on the same *McDonnell Douglas* burden-shifting analysis as do other Title VII claims.  *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).  Thus, a plaintiff bears the burden of establishing a *prima facie* case of retaliation by showing that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there

_____

medication, and readily agreed that "anyone who is taking medication that makes them drowsy has no business being behind the wheel of an eighteen-wheeler."  (Davis Dep., at 36.)  There is no evidence from which any reasonable factfinder could conclude that Great Southern's refusal to allow Davis to work during that time period was motivated by anything other than a legitimate, nondiscriminatory desire to verify that Davis could safely operate a commercial vehicle, notwithstanding his drowsiness-inducing medication.

[17]    The Complaint also alleges generically that Great Southern's "treatment" of Davis constituted retaliation.  (Complaint, ¶ 78.)  A fair reading of the Complaint divulges no clues as to what, if any, other aspects of Davis's "treatment" might be in dispute.  The Court will not speculate as to what such vague language might have been intended to cover, when nothing in the Complaint or the record sheds light on that question.

[18]    *See also Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed").

was a causal link between his protected activity and the adverse action. *See Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 (11th Cir. 2003); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). If a plaintiff makes a *prima facie* showing, then the employer must articulate a legitimate, non-retaliatory reason for the challenged decision. *See Brochu*, 304 F.3d at 1155; *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant produces legitimate reasons for the adverse employment action, then the plaintiff must show that defendant's stated reasons are pretextual. *See Brochu*, 304 F.3d at 1155. Of course, the ultimate burden rests on the plaintiff to show that the employer's stated reason is a pretext for unlawful retaliation. *See Pennington*, 261 F.3d at 1266.

          *2. No Causal Connection.*

      Plainly, Davis had engaged in protected activity by filing the *Cooley* action against Great Southern in June 2003. Moreover, there is no doubt that Davis faced adverse employment actions in the form of having assignments withheld from March to September 2004 and being discharged in September 2004. But his proof comes up far short on the "causal connection" front. "To establish a causal connection, a plaintiff must show that ... the protected activity and the adverse action were not wholly unrelated." *Gupta*, 212 F.3d at 590 (citation omitted). The record provides no inkling as to how plaintiff might seek to establish the requisite causal link. "For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *Id.* But there was no close temporal link between the June 2003 lawsuit and these events, which occurred 9 to 15 months later. *See Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period between [the protected expression and the adverse action] does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."); *Wascura*, 257 F.3d at 1248 (gap of four months too long to constitute close temporal proximity). Nor is any other basis for inferring such a causal nexus apparent from the record.

      Even if Davis could establish a *prima facie* case of retaliation as to the work assignments and discharge, for the reasons stated *supra* Great Southern has articulated legitimate nondiscriminatory reasons for both of those decisions, and the record does not support a finding of pretext. These Title

VII retaliation claims cannot stand.

Lastly, plaintiff brings retaliation claims predicated on the company's alleged opposition to Davis's applications for workers' compensation and short-term disability benefits. Both claims are factually unfounded. Davis conceded in his deposition that he had never filed a workers' compensation claim while in Great Southern's employ. (Davis Dep., at 75-76.) If Davis never filed for workers' compensation benefits, then Great Southern obviously could not have unlawfully opposed such a request. Similarly, the only record evidence that Great Southern opposed Davis's short-term disability claim is Davis's contention that "it took me forever to get the disability, the short-term disability." (*Id.* at 92.) There are myriad reasons why the processing of plaintiff's short-term disability claim might have been delayed, the vast majority of which have nothing to do with any acts or omissions of Great Southern. The record creates no reasonable inference that defendant was to blame for the timing of the award of short-term disability benefits to Davis. There being no record evidence from which a factfinder might reasonably conclude that Great Southern opposed Davis's request for short-term disability benefits, no claim of Title VII retaliation can be predicated on such nonexistent opposition.

## IV.    Conclusion.

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 21) is hereby **granted**. Plaintiff's claims are **dismissed with prejudice**. A separate judgment will enter.

DONE and ORDERED this 29th day of January, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE